### In re HARRINGTON.

(District Court, N. D. Texas. February 12, 1900.)

BANKRUPTCY—BUSINESS HOMESTEAD—ABANDONMENT.

The bankrupt, who was a cabinetmaker and undertaker, owned and used in his business a brick building, standing on the same lot with his residence, and also a small workshop. Under direction of his attorney he closed and locked the brick building at the time he filed his voluntary petition in bankruptcy, and the building and its contents, the bankrupt's stock in trade, passed into the possession of the trustee. The bankrupt continued to work at his trade in the small shop, and testified that he intended to resume the same business in the brick building as soon as possible. *Held* not such an abandonment of the brick building as a business homestead, under the laws of Texas, as would forfeit the bankrupt's right to claim it as exempt, and the same should be surrendered by the trustee to the bankrupt.

In Bankruptcy. On review of decision of referee in bankruptcy.

Chas. Crenshaw and Wilkins, Vinson & Batsell, for bankrupt.

J. F. Holt, for trustee in bankruptcy.

MEEK, District Judge. At the request of A. Harrington, bankrupt, F. B. Dillard, referee, certifies to the court the question as to whether or not the brick storehouse located on the north end of lot No. 8 in block No. 1, O. T. P., of Sherman, Tex., is exempt to the bankrupt, as his business homestead, under the exemption laws of the state of Texas. The bankrupt, in his schedule of exempt property, claims lot 8 in block 1, and all the buildings thereon, as being exempt to him as his family residence and business homestead. No question was made by the trustee in bankruptcy as to the exempt character of all of the buildings on said lot, save and except as to the brick storehouse. He claimed that this brick storehouse was not exempt, and passed to the trustee as a part of the estate of the bankrupt, to be reduced to money and distributed among his creditors. The referee heard the evidence upon this issue, and resolved the question in favor of the trustee; holding that the brick storehouse was not exempt to the bankrupt as his place of business, and that the title passed to the trustee as of the date of the adjudication in bankruptcy. The evidence taken upon the trial of that issue is before me, and I quote from it. A. Harrington, the bankrupt, in the course of his examination, testified as follows:

"I am 68, going on 69, years of age. I have a family, consisting of myself, wife, and children. I have a residence in the city of Sherman, being the lot where I live. I live on lot 8, block 1, of the old addition to the city of Sherman. I bought it 32 years ago. I have been living on the place 32 years, and I have continued to live there ever since. I had a family when I bought the property,—wife and small children. My wife is still living. She is 67 years of age. I paid $400 for the property. Bought it for the purpose of a residence and workshop. Was working at the cabinet trade at that time. Worked in that cabinet shop when I bought the property. First established the house as a place of business as soon as I bought it. Have continued in business there ever since. No cessation at all. My trade is a cabinet workman, but I have worked nearly all the time as an undertaker. The term 'undertaker' includes that of embalming. All undertakers should know how to embalm. Have practiced embalming. I was one of the first in the state of Texas. I have gone to several schools of embalming. At the time I filed my petition in bankruptcy I was living at the same place, and was doing business right on the same lot. My present business house stands where the original workshop stood. The old house that I commenced business in was afterwards displaced by another house. I built a house right over it,—a wooden house,—and that was used for a hotel for a while. After that I tore it down and built a brick house, about six or seven years ago. The brick house was 25x70 feet in size. My workhouse was just back—just west—of the brick house, which fronted on Crockett street. They are not together, but I consider them together. That is where I done my work. I have done considerable business. I have furnished coffins for over six thousand persons. I carried no other goods in connection with my business, except a little molding. Kept a very good stock of coffins, which were used for burying people. Carried a stock of about two thousand dollars' worth, most of which was kept in the brick house, below stairs. They were there exposed for sale. That part of my business occupied the brick house. That was my store, in which was the principal part of my business. I stored coffins in the upstairs of that building. Kept coffins there most all the time the last four or five years. At the time I filed my petition in bankruptcy my stock was worth $1,400 or $1,500. The coffins upstairs were moved down two to four days before the filing of my petition. Were bound to have them all together, for the purpose of filing my petition in bankruptcy. The trustee, Mr. Dulin, has had possession of the lower floor of the brick building since I filed my petition. Has had it locked up. Has been locked up for about two months. Was locked up before I filed my petition. Was advised to lock it up by my attorney. Was locked up a week before the filing of my petition. When the trustee took charge, he locked it up, and has held it ever since. I have had possession of the upper story. The trustee has not interfered up there. There has been in the workshop in the rear of the brick house carpenter's tools and some lumber used in working in any kind of carpenter work. The tools were kept there to cut lumber in making coverings for coffins when lowered in the grave. Lumber was used in the undertaker's business. The tools were used in carpenter work. The lumber was necessary in my business, and so were the tools. Everything in that shop was necessary to my business. Since filing my petition I have used that shop every day or so, nearly. Have made several homemade coffins. That is the principal part of what I have been doing. Have used it for nothing else. My work since filing my petition has been on the lines of the undertaker's business, but on a much smaller scale. * * * I have engaged in no other business since filing my petition, and have followed no other business for 20 years. It certainly is my intention to resume business in the brick building as soon as I can. * * * My intention at the time I filed my petition in bankruptcy was, just as soon as I could, to resume business. Never thought of anything else. Don't know anything else. Have no other business house. Have no other place of business. Have no other place I can use as a place of business. Have no other means of supporting my family, besides my trade. I know no other business. It was built for that purpose. It was necessary for the support of myself and family. The embalming instruments, apparatus, etc., are in that shop; and, when I said everything in that shop was necessary in my trade as undertaker, I included embalming instruments. Could not do without

them. * * * The little workshop spoken of is right at the west end of the brick house,—about ten feet from the brick house, I reckon. My residence is on the south side of the lot. It is about ten or twelve feet between my residence and the brick house. Since I filed my petition I have been working in my shop, making coffins. I have been making them for the county. It was a general workshop before I filed my petition. I have used it ever since the brick house was built. It was built for that purpose,—the same purpose I have used it for since filing my petition."

In response to the question, "In regard to carrying on your business in future, suppose you are unable to secure material and goods to carry on your business as you carried it on prior to your petition in bankruptcy, what would you do with the building then?" the bankrupt answered:

"Well, sir, I would simply use it for this purpose: I have the contract with the county to make pauper coffins, and, as I am a cabinetmaker by trade, I would have a cabinet shop in the rear of the building. Of course, I have to make a living, and will have to do what I can with the cabinet and undertaker's business. I started in life as a cabinetmaker, and added the undertaker's business to it. If I could not carry on the undertaker's business as I did, I would do as much in that line as I could. It would require the biggest portion of the building for storage and work. It would take about all the building to carry on the business. In carrying on the business I have just described, it would be necessary to make a display of my goods, and some space would be necessary. It would be necessary to use the greater portion of the building, and I would do it. I don't see how I could make a living for myself and family unless I could get up a cabinet business and carry on a branch of the undertaker's business. * * * I had very small means when I started in the undertaker's business. The first means I had was very hard work, and got little for making a coffin. I had about ten dollars. I could carry on the undertaker's business without any means in my own possession. It would take a very small means to carry it on. I think I made a coffin the other day for about four dollars,—about the cheapest thing I could put up. I went and got lumber and made it, and I think it cost me about four dollars to do it. I could carry on some business with five or six dollars. * * * The shop back of the brick building was moved there a year ago, or something like it. The woodwork has not always been done in the shop. After the coffins were made and put together they were brought in the end of the brick house, and there stained and got ready for use. I think I stated that the outside was all done in the shop, but that would not include the whole thing. There was this to do, and which I always did do, after making the coffins: After making the coffin in the shop, as soon as it was done and thoroughly finished it would be stained and varnished, and set back until I wanted to use it. I have one setting there now [meaning in the rear end of the brick house]. There is not room enough in the shop to do all the work. I have not been doing any cabinet work lately, except picture-framing etc. If I ever return to business, there would not be room enough in the shop. I would not try it."

Charles Crenshaw, Esq., attorney at law, testified, in part, as follows:

"Mr. Harrington's petition in bankruptcy was prepared by me about two or three weeks and a half before it was filed. It was held by me, with instructions from Mr. Harrington to see if a compromise could not be effected with his creditors. * * * The petition was then mailed by me on Saturday, at 11 o'clock. After I mailed the petition to the United States clerk at Paris, I went to Mr. Harrington's place of business, and told him to hold open until his usual hour of six, and not to open on Monday morning; that the clerk would receive the petition either on Sunday or Monday, and after it was filed he must not sell any goods, and to keep his store closed until the petition came back to Judge Dillard. On Tuesday of the following week I saw Judge Dillard.

and learned that the petition had not been returned; and on the next day (Wednesday) I met Judge Dillard, and he told me that he had the petition. Judge Dills was appointed receiver on the next day, is my recollection, and Harrington was instructed to turn over the key to Mr. Dills, the house remaining closed that week."

For many years before and at the time of the preparation of Mr. Harrington's petition in bankruptcy, he had been an undertaker and embalmer. Starting with a capital of $10 and his own skill and energy, he had built up, through years of industry, quite a large undertaking business in the city of Sherman. ·Before his bankruptcy his place of business consisted of a brick storehouse and a small wooden shop in the rear. He had his stock of coffins in the brick storehouse, and used the shop in making cheaper grades of coffins, which, after being fashioned, were placed in the brick storehouse, and there stained and varnished, and held for use and disposition. He had, according to his testimony, furnished coffins for over 6,000 persons since becoming an undertaker. The door of his business house was closed by direction of his attorney at the time his petition in bankruptcy was mailed to the clerk of the court, at Paris, for filing. From that moment he held the stock of goods in his store, together with his other assets, outside of his exemptions, as a fund to be distributed among his creditors.

The trustee, in his contention that there was an abandonment of the business homestead which defeated the right to its exemption, relies largely upon the decision of the supreme court of Texas in the case of Tackaberry v. Bank, 85 Tex. 488, 22 S. W. 151, 299. In that case Mrs. Tackaberry made a general assignment for the benefit of her creditors. Her stock of goods and the storehouse in which she was conducting a general merchandise business passed to the assignee, who sold the storehouse to the City National Bank of Ft. Worth. Mrs. Tackaberry brought suit in trespass to try title against the bank, seeking to recover the storehouse and lot on which it stood, on the ground that it was her business homestead. The supreme court, under the facts of that case, held that there had been an abandonment of the business homestead, and that she could not recover it. The record in that case, so far as it is contained in the statement of the case and the opinion of the court, does not disclose any evidence of intention on the part of Mrs. Tackaberry either to continue or to resume her business in the place she was conducting it at the time she made her general assignment for the benefit of creditors. Chief Justice Stayton, in the course of his opinion in that case, says:

"Cessation of business, the pursuit of which gives the exemption, has practically the same relation to the right to have the exemption continue as has the removal of the family from the home; and in these cases the intention with which the removal of the family or cessation of business is made determines the further right to exemption. It has been held in several cases that the making by an insolvent of a general assignment for the benefit of his creditors does not of itself defeat his right to have exemption of his place of business continue; but it never has been held that the exemption would continue if at the time the assignment was made there was no intention to continue on the premises the former business, or to pursue some other of character such as to give exemption."

In the case now under consideration there is not only an avowed intention on the part of Mr. Harrington to resume business, but to resume the same business, on the same premises. More: The resumption of the business on a portion of the premises was already accomplished, though in a humble way, at the time the bankrupt testified in this case. Chief Justice Stayton further says in the discussion of the Tackaberry Case:

"It is not like a case in which a mechanic, having a shop and tools with which he carries on his business, makes an assignment in general terms conveying all his property except such as is exempt from forced sale. In that case everything owned and necessary for the business is excepted, while in this and like cases all the personal property necessary to the existence of the business, it must be conceded, passed, and was intended to pass, by the assignment. The business was practically destroyed by the conveyance of the things necessary to its existence, and the same inferences as to discontinuance of business ought to be drawn in the two cases, solely from the fact that an assignment was made. If it were shown that the business, however, was carried on until the very moment the deed became operative, we do not see that, upon principle, the result would be different; for all persons making such conveyances do so with the knowledge that the act, in its consummation, destroys the business, and must be held to have contemplated that result. Thus is furnished one of the facts on which abandonment must depend."

The undertaker's business, as defined and explained by Mr. Harrington, and as carried on by him, involved more than the mere purchase, display, and sale of coffins in his place of business at Sherman. In his shop he had the tools and instruments necessary for the making of coffins, and boxes within which to place coffins before they were lowered into the graves. He also had embalming instruments which he used in treating and preserving bodies of the dead before interment. The filing of his petition in bankruptcy, while it deprived him of the stock in trade that filled his place of business, did not and could not entirely destroy his business, and he did not contemplate such a result. Since his adjudication in bankruptcy, and since the door of his business house has been closed upon him, he has carried on the business and occupation of an undertaker. He has made several coffins for the pauper dead of Grayson county. He has left to him his tools and his own skill, and raw material for coffins is fortunately within his reach. It is therefore demonstrated that his business was not destroyed by the conveyance of his stock of coffins in the storehouse, because the things necessary to the existence of his business still belong to and subsist in him, and cannot be taken away by the filing of a voluntary petition in bankruptcy. It is not for the court to say that the little shop in the rear of the brick storehouse affords reasonably sufficient accommodations for Mr. Harrington to prosecute the calling of an undertaker and embalmer in now; for he has prosecuted that calling for many years in the brick storehouse, and the calling is still his, and he is still prosecuting it, and the law provides that the business homestead shall be exempt and saved to a man and his family in the time of their need. It may be that, while Mr. Harrington occupies and uses the brick building as an undertaker and embalmer, it will never again contain the assortment of coffins it once contained, because he is old and his energies are waning; but, so long

as he makes the coffins of even the pauper dead of Grayson county, the law will protect him in the use of his premises. At what hour the body of some wayfaring man may be brought to Mr. Harrington's undertaking establishment, there to be embalmed and prepared for shipment to friends, no man can tell, and when this happens Mr. Harrington's brick storehouse will give cover to him in the prosecution of his solemn calling; and the surroundings and appointments of the brick house will be much more fitting and appropriate than the surroundings and appointments of the little shop in the rear, which has been set apart to him by the trustee. This being the view of the court, the action of the referee herein is reversed, and the order heretofore made by him directing the trustee to take charge of the brick storehouse on lot 8, block 1, in the city of Sherman, as part of the estate of the said A. Harrington, bankrupt, is hereby set at naught. It is ordered that the trustee forthwith turn over to the said A. Harrington, bankrupt, the possession of said brick storehouse on lot 8, block 1, and that all costs of the proceedings in relation hereto be paid by the trustee out of the funds of the bankrupt estate.